**MIDWEST OILSEEDS, INC., Plaintiff,**

v.

**LIMAGRAIN GENETICS CORPORATION, f/k/a Callahan Enterprises, Inc., Defendants.**

No. 4:00–CV–90695.

United States District Court,
S.D. Iowa,
Central Division.

Nov. 4, 2002.

Roger T. Stetson, Edward M. Mansfield, Danielle M. Shelton, Belin Lamson Mccormick Zumback & Flynn PC, Des Moines,

IA, Paul D. Burns, Bradley & Riley, Cedar Rapids, IA, Nick Critelli, Critelli & Associates, Des Moines, IA, for Plaintiff.

David L. Phipps, John F. Fatino, Whitfield & Eddy PLC, Des Moines, IA, Michael Rosiello, William E. Padgett, Barnes & Thornburg, Indianapolis, IN, Francis Digiovanni, George Pazuniak, Connolly Bove Lodge, Wilmington, DE, for Defendants.

### MEMORANDUM OPINION AND ORDER

PRATT, District Judge.

Plaintiff, Midwest Oilseeds Inc. (MO), brings this action in diversity against Defendant, Limagrain Genetics Corporation, formerly known as Callahan Enterprises, Inc. (CEI), seeking legal and equitable relief for claims of breach of contract, conversion, and misappropriation of trade secrets. CEI has counterclaimed for breach of contract, restitution because of mistake of fact, unjust enrichment, misappropriation and conversion via breach of contract, and misappropriation of trade secrets. Presently before the Court are three motions for summary judgment. Plaintiff MO has moved for partial summary judgment on Count I of its complaint for breach of contract. Plaintiff's second motion seeks an entry of summary judgment on all of Defendant's counterclaims. In its own motion, CEI prays this Court grant summary judgment against Plaintiff on all causes of action. The parties have submitted briefs and other papers supporting and resisting the various motions. The Court heard oral argument on all motions on October 17, 2002. The matter is fully submitted.

The Court finds that CEI breached its contractual agreement with MO, and finds CEI liable for damages as described in the seed purchase agreement. MO's Motion for Partial Summary Judgment on Count I of its Complaint is granted. Plaintiff's Motion For Summary Judgment on All Counterclaims is denied as to Defendant's first counterclaim for breach of agreement; disputed issues of material fact preclude summary judgment on this counterclaim. The motion is granted on all other counterclaims. Defendant's motion for summary judgment is denied. To the extent, however, that Defendant's motion identifies pleading deficiencies in counts IV, V, and VI of Plaintiff's complaint, the motion is granted.

## I. INTRODUCTION

██ The legal nature of the present case is predominately a straightforward breach of contract case. MO and CEI entered into a contract whereby each party agreed to do and to forego from doing certain things. As the story often goes, a dispute arose and litigation followed when one party or the other failed to do what it promised it would do, or did what it promised it would not do. In any contract case, the party asserting the claim bears the ultimate burden of proving the elements of the breach. The Court recognizes that granting summary judgment in favor of the party with the burden of proof is a necessarily rare occurrence. *Turner v. Ferguson,* 149 F.3d 821, 824 (8th Cir.1998). This case proves itself the exception.

The question before the Court on Plaintiff's summary judgment motions is whether the legal construction of the contract terms mandates an entry of judgment based on the undisputed facts, or if summary judgment is forestalled because the determination of whether a party's conduct falls outside the scope of the contract hinges upon the resolution of disputed material facts. MO's breach of contract claim is the rare case where MO bears the burden of proof, yet the undisputed facts clearly evince MO's right to recover on its breach of contract claim. CEI's first counterclaim

for breach of contract is the more familiar case where factual disputes preclude summary judgment for either side.

While the legal issues are recognizable in this case, the underlying subject matter, plant genetics, is less familiar. The relationship between the parties involves the genetic crossing and breeding of soybean germplasm with the ultimate goal of developing new and marketable lines of soybean seeds. To understand this relationship, the terms of the contracts, and the present dispute, one needs to understand the basic principles of genetic crossing and soybean breeding. Thus, with a tip of the hat to Gregor Mendel[1], the Court plunges into the miniaturized world of plant genetics and soybean breeding.

## II. GENETICS 101

The practice of soybean breeding involves genetically crossing two distinct variations of soybean seeds with the ultimate goal of producing a crossed offspring variation that exhibits the combined favorable traits of the two parent seeds. The initial cross between the two parent seeds is known as an A × B cross. Every A × B cross produces one of four possible results that are easiest to understand if one envisions each parent seed as having desired genetic traits (represented as A and B) and undesired genetic traits (represented as a and b). Thus, the A × B cross is more accurately represented as Aa × Bb. The possible results of the cross are, therefore: 1) ab, wherein the undesirable traits of both parents are exhibited in the offspring variation; 2) Ab, wherein the offspring variation exhibits the desirable traits of A and the undesirable traits of b;

3) aB, the inverse of the second result; and 4) AB wherein the resultant variation possesses the desirable traits of both the A and B parent seeds. In practical terms, the first result is pragmatically useless as the resultant seed has no desirable traits. The second and third results are of no consequence as the cross produced a seed that was no better than the favorably represented parent seed. Thus, the only desirable result is the fourth, wherein the offspring variation possesses the favored traits of both parents. For soybean seeds, the length of time between the initial cross and the realization of a marketable variation is around six to seven years.

Regardless of the result, the offspring variation owes fifty percent of its genetic information to parent A and fifty percent to parent B. Thus, assuming the cross produces the desired result, the offspring variation is represented not as seed C, but as seed AB. AB is known as a first generation offspring variation of the initial A × B cross. As AB is a distinct variation, it can now be crossed with other distinct seed variations to develop second generation variations. For example, one might cross AB with seed C.[2] As with the initial A X B cross, both AB and C have desirable and undesirable genetic traits. Thus the second generation cross is accurately represented as ABab × Cc. The desired result of the cross is, of course, ABC, in which fifty percent of the genetic material comes from C and fifty percent comes from AB. Importantly, one must not forget that the AB half of ABC represents twenty-five percent of the genetic code from A and twenty-five percent of the genetic code from B. The genetic contributions from the

---

1. (1823–1884). Considered the father of genetics, the Austrian monk's revolutionary 1866 paper "Experiments with Plant Hybrids," went largely ignored until it was rediscovered at the turn of the twentieth century.

2. In addition to crossing AB with C, the breeder can also "backcross" AB with one of its parents. Assuming AB is backcrossed with A, the resulting variation would be seventy five percent A and twenty-five percent B. The offspring variation of such a backcross would be represented as AAB.

initial parents are never eliminated from the equation regardless of how many successive generations are created.

## III. BACKGROUND

### A. The Early Years

This tale of two companies begins twenty-five years before Plaintiff Midwest Oilseeds, Inc., filed this action in the County Court of Dallas County, Iowa on November 29, 2000. In 1975, Midwest Oilseeds, Inc., an Iowa corporation formed by Harry Stine in 1972 to breed soybean seed, and Callahan Enterprises Inc., an Indiana corporation founded in 1964 by husband and wife, Noel and Carolyn Jo Callahan, first paired up to breed and market new variations of soybean seed. Under the initial agreement, MO would develop seed, and CEI would serve as MO's exclusive seed distributor, subject to prior agreements between MO and other marketers. The two companies renewed their basic agreement in 1981. Until 1981, CEI did no breeding of its own.

In 1981, CEI commenced its own breeding program, and began to acquire germplasm and breeding techniques from various sources. As well, CEI hired Dr. Marshall Garland, a professional soybean breeder to head up the new project. In February 1982, CEI expanded its new breeding program by entering into a "Research Fee Agreement," with MO. Under the agreement, MO provided CEI with germplasm and breeding techniques so that CEI might develop new marketable offspring variations from the MO germplasm. The parties then paid research fees to each other for sales of seeds developed under the agreement. The 1982 agreement continued until early 1986 when MO gave CEI notice of termination.

After MO terminated the 1982 research fee agreement, the parties began negotiating a new agreement. During the course of these negotiations and the drafting of the new agreement, MO was not represented by counsel. CEI had in-house counsel, Cynthia Wicker, who was involved in putting together the new agreement. On March 14, 1986, Noel Callahan and other CEI representatives met with Harry Stine and his wife Molly at a hotel near the Des Moines Airport. Callahan brought the final typed agreement with him. After making some handwritten amendments, Stine and Callahan signed the 1986 agreement that provided that CEI and MO would develop, test, and produce soybean varieties.

### B. Terms of the 1986 Agreement

The 1986 agreement significantly added to and amended the 1982 agreement. Many of these amendments form the basis of this lawsuit and, therefore, demand attention. While the 1982 agreement provided that ownership of any developed varieties would remain with the originating party, the agreement failed to define the term "originating party." The 1986 agreement retained the 1982 provision, and defined originating party to mean "the party who does the first year tests, (Year 3—Schedule A) and second year tests (Year 4—Schedule A) and the party who acquires any lines from outside sources." § 1(c), 2(b), CEI App. A8. As well, the 1986 agreement added clauses to the 1982 agreement's exclusions section. Under the 1986 agreement, CEI and MO now possessed the power to delete, and therefore exclude, lines from the program if CEI or MO had developed the line. § 10(c), CEI App. A11.

The most significant change under the 1986 agreement is section four entitled Private Label Soybean Licensing Agreement. In 1983, MO began restricting the use of their soybean seeds.[3] Section 4(a).

3. CEI began restricting its germplasm in 1991.

of the 1986 agreement provided that "CEI and MO shall sign Private Label Soybean Licensing Agreements as approved by MO and CEI with all participating seed companies and seedsmen." Section 4(b). attached MO's Limitation of Warranty and Seed Purchase Agreement to the 1986 agreement and provided that this document would apply to all MO developed seeds and that the principles therein would be incorporated into the private label agreements described in § 4(a). Under the Seed Purchase Agreement, recipients of MO seeds were limited in their use of the seeds for feed or processing. The agreement expressly prohibits using MO seeds "for seed, breeding, or any variety improvement purposes." The Seed Purchase Agreement also contained a liquidated damages clause of ten dollars per bushel for each bushel of seed used or sold in violation of the seed purchase agreement. Section 4(b) of the 1986 agreement excepted CEI "from the restrictions of the Seed Purchase Agreement for purposes of making A × B crosses (not back crosses or biotechnical alterations) if such resulting populations are available for use by MO and subsequent lines selected from the populations are marketed under the terms of [the 1986] agreement." CEI App. A9.

## C. The Present Dispute

Initially, the parties breeding program operated as contemplated by the 1986 agreement. MO provided CEI with its various germplasm which CEI used to cross with other seeds. When CEI developed a line MO was provided access to the line, and CEI paid MO a one-third share for sales of CEI originated seeds that contained at least one MO parent. In July 1987, however, Stine wrote Callahan alleging that CEI had breached the agreement by "enter[ing] into contracts with other entities to provide them with soybean seed developed by [MO] without securing approval by [MO] pursuant to Section 4(a)

and without including in such contracts the restrictions required by Section 4(b) of the March 14, 1986 Agreement." MO App. 167. In responding to Stine's allegations, Callahan noted that CEI was "implementing the program" of notifying companies of the restrictions in section 4(b) of the 1986 agreement. MO.App. 205.

Over the next three years, CEI made three attempts to have MO modify the terms of the 1986 agreement. In August 1987, Callahan wrote to Stine specifically suggesting an amendment to section 4(b). Callahan's proposed amendment sought bilateral protection for both CEI developed seeds as well as MO developed seeds under the attached seed purchase agreement. Stine declined the request to amend the agreement. In February 1988, Callahan again wrote to Stine suggesting an amendment to the 1986 agreement. The 1988 letter proposed a new contract that would again create bilateral protection for both CEI developed seeds and MO developed seeds. MO again declined CEI's offer.

In 1988 Rhone–Poulene, a French company, acquired CEI for sixteen million dollars. In a May 1989 internal document pertaining to the CEI/MO contract, Rhone–Poulene's first recommendation on "germplasm policy" was to "Delete present CEI restrictions and have mutual use policy." Mo.App. 154. Shortly thereafter, in June 1989, the President of Rhone–Poulene Ag Company wrote Stine. The letter gave MO the option of discussing either selling out to Rhone–Poulene or amending the 1986 agreement. MO App. 237. CEI then sent MO a formal notice of termination of the 1986 agreement on July 1, 1989, effective in two years. Under the terms of the 1986 agreement, either party could terminate the agreement with two years notice, but the agreement provided that research fees would continue regardless of any termination.

Limagrain Genetics, another French company, acquired CEI in 1994. In 1996, Limagrain conducted a "legal contract review" of the 1986 agreement and determined that it need not pay MO any research fees. MO App. 101, 107, 207. Since acquiring CEI in 1994, Limagrain has marketed seed lines where one or both of the parent seeds was originally obtained from MO to several seed companies for the purpose of breeding new seed varieties without MO's consultation, knowledge or approval. In 1999, CEI's successor Limagrain licensed all soybean germplasm to Soygenetics, L.L.C. without restriction, and turned over its soybean breeding program to Soygenetics. Limagrain, however, owns thirty-seven percent of Soygenetics.

As noted above, Plaintiff MO originally filed its case in state court in Dallas County, Iowa. Defendant removed the case to federal court under this Court's diversity jurisdiction. Following a discovery phase that would kindly be termed contentious, the parties filed the dispositive motions presently before the Court.

## IV. SUMMARY JUDGMENT STANDARD

The purpose of summary judgment is to "pierce the boilerplate of the pleading and assay the parties' proof in order to determine whether trial is actually required." 11 Moore's Federal Practice 3d, § 56.02, pg. 56–20 (Matthew Bender 3d ed.1997) (citing *Wynne v. Tufts Univ. School of Medicine*, 976 F.2d 791, 794 (1st Cir.1992), cert. denied, 507 U.S. 1030, 113 S.Ct. 1845, 123 L.Ed.2d 470 (1993)).

Rule 1 of the Federal Rules of Civil Procedure mandates that all Rules, including Rule 56, "be construed and administered to secure the just, speedy, and inexpensive determination of every action." Accordingly, summary judgment is not a paper trial. "The district court's role in deciding the motion is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe." *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir.1994). In a motion for summary judgment this Court has but one task, to decide, based on the evidence of record as identified in the parties' moving and resistance papers, whether there is any material dispute of fact that requires a trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); 10 Wright, Miller & Kane § 2712, at 574–78. The parties then share the burden of identifying the evidence that will facilitate this assessment. *Waldridge*, 24 F.3d at 921.

Summary judgment is properly granted when the record, viewed in the light most favorable to the nonmoving party and giving that party the benefit of all reasonable inferences, shows that there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Walsh v. United States*, 31 F.3d 696, 698 (8th Cir.1994); *City of Columbia*, 914 F.2d 151 at 153; *Woodsmith Publ'g*, 904 F.2d 1244 at 1247. The moving party must establish its right to judgment with such clarity that there is no room for controversy. *Jewson v. Mayo Clinic*, 691 F.2d 405, 408 (8th Cir.1982).

## V. DISCUSSION

In its First Amended and Substituted Complaint, Midwest Oilseed asserts six separate causes of action. Defendant CEI responds with seven separate counterclaims of its own. MO seeks summary judgment both on CEI's liability for breach of the 1986 agreement, and to dismiss all of CEI's counterclaims. CEI's motion asks that the Court vindicate CEI on all counts alleged in Plaintiff's complaint. Although issues abound, the predominant question is a determination of

the parties' rights and obligations under the 1986 agreement. Thus, the Court will first address both sides' breach of contract claims. The analysis will then focus on CEI's remaining counterclaims. Finally, the Court will address MO's other claims.

## A. Breach of Contract

### 1. CEI's breach of agreement counterclaim

■■■ CEI's first counterclaim alleges that MO breached the 1986 agreement by marketing certain seed lines without paying CEI the research fees it was due under the agreement. MO offers two defenses: first that the majority of the lines identified by CEI are not subject to the agreement's research fee provisions because the lines were not in the elite test phase or already commercialized when the contract was terminated; for those lines that were subject to the payment of research fees, MO argues that it had deleted the lines pursuant to section 10 of the agreement. Upon termination of the agreement, section 9 clearly states that research fees attach to lines in either the first or second year of elite trials under schedule A, or that have already been commercialized. Any lines that had not reached this phase in the breeding process are automatically exempted from the research fees provision. Thus, to the extent that CEI's first counterclaim seeks to recover research fees for exempted lines under section 9 of the agreement, MO's motion for summary judgment is granted. Summary judgment, however, is improper on the remaining lines.

Section 10 of the agreement does provide either party with the power to delete lines from the purview of the agreement. The agreement, however, offers no indication as to the necessary procedure for deleting lines in the agreement. No written record exists to detail which lines MO might have deleted. As such, the only evidence of any deletions is the deposition testimony of Harry Stine. Any decision based on this evidence involves a weighing of sufficiency and credibility. Such is not the purpose of summary judgment. For those lines that are not automatically excluded by section 9, a question of material fact remains as to whether MO deleted the lines. Summary judgment is, therefore, denied.

### 2. MO's breach of contract claim

■■ Midwest Oilseeds argues that it is entitled to summary judgment on count I of its complaint because CEI breached the 1986 agreement by: 1) improperly licensing third-party breeding rights for seeds that owe their lineage to restricted MO seed; and 2) by performing unauthorized breeding itself beyond the A × B crosses stated in the agreement. CEI does not deny any of MO's factual allegations regarding third-party licensing or CEI's breeding practices. Rather, CEI argues that because it owns the first generation seed created from the initial A × B cross with MO seeds, CEI can do with its seeds as it pleases. Thus, the question is one of contract construction.

■■■ Iowa law requires that any court exercising its power to interpret the terms of a contract must adhere to a three level hierarchy of interpretation. Most importantly, the Court looks to the words of the contract. If the terms are unambiguous, the Court has no right to substitute a different meaning for that which the parties clearly intended. *See Walsh v. Nelson*, 622 N.W.2d 499, 503 (Iowa 2001) ("after the transaction has been shown in all its length and breadth, the words of an integrated agreement remain the most important evidence of intention."). If the terms are ambiguous, the Court will next consider extrinsic evidence of the negotiations and then the subsequent dealings

between the parties. *Id.; Kroblin v. RDR Motels, Inc.,* 347 N.W.2d 430, 433 (Iowa 1984) (reasoning that the trial court properly considered post signing conduct as evidence of parties' intentions). Thus, the Court looks at: 1) the plain language of the contract; 2) the circumstances surrounding the negotiations and execution of the contract; and 3) the parties' course of dealing following execution of the contract. Applying this analysis to the present case indicates that MO is entitled to an entry of summary judgment as CEI's actions clearly fall outside the bounds of the agreement.

Section 4(a) of the 1986 agreement unambiguously provides that "CEI and MO shall sign Private Label Soybean Licensing Agreements as approved by MO and CEI with all participating seed companies and seedsmen." Equally clear, section 4(b) states:

> The Limitation of Warranty and Seed Purchase Agreement, a copy of which is attached, shall apply to all MO developed seeds and the principles of such shall apply to all MO developed seeds and the principles of such shall be incorporated into the Licensing Agreements referred to in sub paragraph a above. CEI research shall be excluded from the restrictions of the Seed Purchase Agreement for purposes of making A × B crosses (not back crosses or biotechnical alterations) if such resulting populations are available for use by MO and subsequent lines selected from the populations are marketed under the terms of this agreement.

The Seed Purchase Agreement incorporated into section 4(b) provides that the MO "seeds herein sold will be used only for feed or processing and will not be used or sold for seed, breeding or any variety improvement purposes. [...] Purchaser acknowledges [MO's] proprietary interest in the use of subsequent production from the seeds herein sold, and agrees it would be a violation of this agreement to allow the subsequent production of the seed herein sold to be used to create a seed variety or seed product from said production, which may be used for seed purposes by individuals or entities other than [MO]."

The language of these provisions is eminently clear. MO sought to protect its germplasm as valuable intellectual property. Accordingly, section 4(a) mandates that on all seeds CEI markets that were developed under this program, i.e. seeds containing MO germplasm somewhere in their genetic lineage, CEI must include a MO approved Private Label Soybean Licensing Agreement. Section 4(b) states clearly that the Seed Purchase Agreement applies to all MO developed seeds, and further explains that the principles of this agreement represent the necessary provisions for an acceptable Private Label Soybean Licensing Agreement under section 4(a). Even CEI's representatives admit that the provisions make clear that CEI had to include the use restrictions of the seed purchase agreement. MO App. 73.

In defense of its position, CEI argues that under the terms of the agreement, it was the owner of all seeds for which it was the originating party. As owner, the argument follows, CEI could do as it pleased with any seed lines it developed. This argument belies the plain language of the agreement, the clear intentions and foresight of MO and Harry Stine to protect a valuable commodity, and the basic nature of genetic breeding. Back to the genetics primer above, CEI's argument is essentially, we took MO seeds A and B, crossed them, and got C. Because C is neither A nor B, MO no longer has any claim to the germplasm. What CEI's argument overlooks, however, is that A × B does not equal C. A × B results in AB. AB is fifty percent A and fifty percent B. The entire

purpose of section 4(a) and (b) of the 1986 agreement is subverted under CEI's argument. CEI may have owned AB, but the 1986 agreement made clear that ownership did not provide CEI with free reign over the offspring variation. Section 4(b) makes clear that CEI is bound by the terms of the Seed Purchase Agreement except when performing A × B crosses and only so long as CEI made any resultant populations available to MO, and marketed any selected lines gleamed from the A × B cross in accordance with the agreement. Not only do these provisions limit CEI's ownership rights, they all but negate the significance of ownership. CEI may not like this aspect of the contract, in fact they tried three times to amend the agreement, but the clear reality is that MO provided CEI with a limited license to breed with its seeds. To suggest that CEI could make one cross, whereby the resulting germplasm consists entirely of MO genetic material, and eliminate all use restrictions of MO's painstakingly developed genetically bred germplasm is not realistic nor within the realm of common sense. MO was protecting valuable genetic information. It has a right to protect this information regardless of who owns the end product in which the code resides. Sections 4(a) and (b) of the 1986 agreement sought to ensure that MO's germplasm would not be revealed or given to its competitors. CEI had an opportunity to negotiate for greater bilateral protection and use of the resultant seeds. It did not do so.

Under the terms of the 1986 agreement, any transfer of seeds with MO germplasm in their genetic lineage required CEI to include an agreement restricting the use of the seeds as described in the seed purchase agreement. Any CEI transfers of seeds with MO germplasm anywhere in their genetic lineage that did not include a use restriction similar to the Seed Purchase Agreement breached the 1986 agree-ment and the Seed Purchase Agreement incorporated therein. As well, any use of MO germplasm, by CEI, beyond the A × B cross specifically described in section 4(b) of the 1986 agreement further violated the agreement. As CEI freely admits to both of these activities, MO's motion for summary judgment on count I of its complaint for breach of contract is granted.

■■■ The extent of CEI's breach is a factual question that must be resolved at trial. That said, the Court finds the ten dollar per bushel liquidated damages clause stated in the Seed Purchase Agreement to be a reasonable attempt by MO to predict the loss it might suffer if its valuable germplasm were divulged to its competitors. The liquidated damages clause was clearly stated in the Seed Purchase Agreement that attached to the 1986 agreement. CEI negotiated with MO over the details of the 1986 agreement. If CEI believed the damage clause unreasonable, the negotiating period before signing the contract would have been a proper time to raise this objection. Damages for CEI's breach of the agreement are set at ten dollars per offending bushel sold or otherwise transferred.

## B. MO's motion for summary judgment on CEI's counterclaims

■■■ In addition to its breach of contract counterclaim, CEI alleges six other causes of action. None of these counterclaims have merit. CEI's second and third counterclaim seek to recover any research fees that CEI had paid MO in the past on theories of mistake of fact and unjust enrichment. CEI argues that it erroneously paid MO research fees under the agreement for several years, and just recently discovered its faux pas. CEI's argument, however, repeats the same defense as in MO's breach of contract action, that CEI owned the resultant offspring variations,

and, therefore, had free reign over the seed. As explained above, this argument fails. Accordingly, MO's motion for summary judgment on CEI's second and third counterclaims is granted.

 CEI's fourth, sixth, seventh, and eighth counterclaims allege that MO improperly used, transferred, marketed or bred with CEI owned germplasm. The 1986 agreement contains no provisions to protect CEI germplasm. The agreement provided that MO would provide CEI with its seeds for CEI to conduct breeding experiments. CEI had no policy to protect its seeds until 1991. Accordingly, MO was within its rights to do as it pleased with CEI developed germplasm. MO's motion on CEI's fourth, sixth, seventh, and eighth counterclaim is granted.

### C. CEI's motion for summary judgment

CEI's motion for summary judgment challenges all of MO's stated claims and the liquidated damage clause under the Seed Purchase Agreement. The Court has already held that CEI is liable for breach under count I of Plaintiff's complaint, and that the liquidated damage clause is a reasonable measure of damages. These portions of CEI's motion are, therefore, denied.

 CEI also asks the Court to dismiss MO's breach of contract claim for want of damages. CEI argues that because MO was late in responding to a request for admission regarding damages MO suffered as a result of CEI's breach of contract, MO has "judicially admitted that it did not suffer any damages." CEI Brief 13. CEI cites Fed.R.Civ.P. 36(a) which provides "the matter is admitted unless, within 30 days after service of the request [...] the party to whom the request is directed serves upon the party requesting the admission a written answer or objection..." CEI argues that MO was twenty days late in responding to the following admissions. "Request 10: Midwest did not suffer any actual damages from any breach of the Agreement alleged by Midwest in this action. Request 11: Midwest does not have any evidence that it lost sales, revenues, or profits due to any breach of the agreement alleged by Midwest in this action." CEI Brief 14. The Court first questions whether such admissions would ever result in any useful information. Second, the Court notes that CEI's argument overlooks Fed.R.Civ.P. 36(b) which provides that a Court permit withdrawal or amendment of an admission "when the presentation of the merits of the action will be subserved thereby and the party who obtained the admission fails to satisfy the Court that withdrawal or amendment will prejudice that party in maintaining the action or defense on the merits.". CEI was not prejudiced by MO's late admission, for which MO had obtained an extension, and CEI has not made any effort to show how it would be prejudiced if any such admission were amended. The merits of the action, however, would be utterly subserved by throwing out MO's claim at this stage of the case because of a late response to a request for admission almost a year ago. CEI's motion for summary judgment on MO's breach of contract claim for failure to state damages is denied.

 CEI argues that MO's claim for conversion is lacking because MO lacked a superior right to possession over CEI seeds. CEI, however, breached the 1986 agreement. Thus, if CEI produced an illicit line in violation of the agreement, CEI did not own the seeds it produced, MO did. As well, the basis of the claim again lies in the germplasm, not the seeds themselves. The value of the entire operation is the germplasm's genetic code. Genetic information can be property, and,

therefore, can form the basis for a common law conversion claim. *See Pioneer Hi-Bred Int'l, Inc. v. Holden Foundation Seeds, ·Inc.,* 1987 WL 341211 (S.D.Iowa 1987), *aff'd on other grounds,* 35 F.3d 1226 (8th Cir.1994); *Del Monte Fresh Produce Co. v. Dole Food Co., Inc.,* 136 F.Supp.2d 1271, 1294 (S.D.Fla.2001). CEI's motion for summary judgment is denied on MO's conversion claim.

As with MO's conversion claim, CEI argues that MO's trade secret claim fails as a matter of law because CEI owned the varieties at issue. Again, where CEI has breached the agreement that provided it the right to breed with MO's germplasm, CEI's argument fails. Summary judgment on MO's trade secret claim is denied.

 CEI correctly asserts that injunctive relief is not a cause of action. To the extent that MO has pleaded injunctive relief as a cause of action in count IV, CEI's motion for summary judgment is granted. The Court retains within its equitable power, however, the right to order injunctive relief if the need arises. As well, CEI is correct that MO's request to enter final judgment with the possibility of more recovery fails under the law. A final judgment is just that, final. All damages arising out of the dispute between the parties must be included in the judgment. Thus, CEI's motion is granted insofar as MO has prayed for relief beyond the power of this Court. CEI, however, has also challenged MO's right to receive punitive damages under its conversion and trade secrets claims. This challenge also lies outside this Court's power. Whether MO is entitled to punitive damages for its conversion and trade secrets claim is a factual question to be determined when factoring all aspects of the final judgment.

## VI. CONCLUSION

Plaintiff Midwest Oilseeds' motion for summary judgment on count I of its complaint is granted. Damages for the breach will be determined in accordance with the liquidated damage clause of the Seed Purchase Agreement in trial at a later date. Plaintiff's motion for summary judgment on all counterclaims is denied with regards to Defendant's first counterclaim for breach of the agreement, and granted on all other counterclaims. Defendant's motion for summary judgment is granted on counts IV and V of Plaintiff's complaint, asserting injunctive relief as a cause of action and seeking a less than final final judgment. Defendant's motion is denied on all other counts.

IT IS SO ORDERED.